## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| Kimberly Fair, | |
| *Plaintiff*, | Case Number: |
| v. | Ad Damnum: **$6,383 + Atty Fees & Costs** |
| **ARB Risk Management Holdings, LLC,** *and* **Unknown ACH Processor,** | |
| *Defendants*. | **JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Kimberly Fair** ("**Ms. Fair**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **ARB Risk Management Holdings, LLC** ("**ARB**"), and **Unknown ACH Processor**, (jointly, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action for damages brought by Ms. Fair against ARB for violations of the ***Fair Debt Collection Practices Act***, 15 U.S.C. § 1692, *et seq.* ("**FDCPA**"), and the ***Florida Consumer Collection Practices Act***, Section 559.55, Florida Statutes, *et seq.* ("**FCCPA**"), and against both Defendants for violations of the ***Civil Remedies for Criminal Practices Act*** ("**CRCPA**"), Section 772.101, Florida Statutes, *et seq.*

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCCPA, Section 559.77, Florida Statutes, the CRCPA, Section 772.104, Florida Statutes, and 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction for Ms. Fair's state law claims pursuant to 28 U.S.C. § 1367.

4.      The Defendants are subject to the provisions of the FDCPA, the FCCPA, and / or the CRCPA, and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

5.      Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred within this District and because all parties reside and transact business in this district.

6.      ARB operates two interactive websites – InboxLoan.com and InboxCredit.com – which offer loans at annual interest rates of 700% and higher.

7.      ARB issues many of these loans to Florida residents, including Ms. Fair, who have received funds which were transferred into their bank accounts in Florida, and have had payments on those loans debited from their Florida bank accounts.

8.      The use of an interactive website which permits Florida residents to apply for loans, along with the making and collecting of loans within the state, establishes a purposeful availment to Florida and is sufficient to establish personal jurisdiction over a defendant. *See, e.g.*, *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

## PARTIES

### Ms. Fair

9.      **Ms. Fair** is a natural person residing in the Community of Brandon, Hillsborough County, Florida, and a *Consumer* as defined by the FDCPA, 15 U.S.C. §1692a(3), and the FCCPA, Section 559.55(8), Florida Statutes.

**ARB**

10.     **ARB** is a Delaware limited liability company.

11.     ARB's Delaware registered agent is **Harvard Business Services, Inc., 16192 Coastal Hwy, Lewes, DE 19958**.

12.     **Stanley Chao** ("**Chao**") is the president of ARB, its chief executive, its Florida registered agent, and the beneficial owner of many online payday lending websites.

**Unknown ACH Processor**

13.     Unknown ACH Processor is the person or entity who processed, at all times relevant, the *Automated Clearing House* ("**ACH**") payment transactions for the websites InboxLoan.com and InboxCredit.com. Plaintiff believes she can ascertain the identity of Unknown ACH Processor since it/they utilized a unique Prearranged Payment and Deposit Identification number ("PPD ID"), to wit, 1028590152.

**ARB IS A DEBT COLLECTOR**

14.     ARB is a *Debt Collector* within the meaning of the FDCPA and the FCCPA, 15 U.S.C. § 1692a(6) and Section 559.55(7), Florida Statutes, respectively, in that it uses e-mail, phone calls, text messages, faxes, and / or other instrumentalities of commerce, interstate and within the State of Florida, for its business, the principal purpose of which is the collection of debts. ARB collects debts purportedly due to Inbox Loan and Inbox Credit, even though both iterations of Inbox are owned and controlled by ARB and Chao and are simply their alter egos. Thus, ARB is a creditor which, in the process of collecting its own debts, uses a name other than its own to suggest that a third person is collecting or attempting to collect such debts.

## FACTUAL ALLEGATIONS

### Chao's Rent-A-Tribe Payday Loan Syndicate

15.     Chao is a businessman who previously lived in a $1.5 million home in Woodcliff Lake, New Jersey, before relocating to a $4 million, 5,386 square-foot Tuscan-style estate in Disney's Golden Oak community near Orlando, Florida.

16.     A significant portion of Chao's wealth stems from loansharking. Chao's companies lend to consumers in Florida at interest rates exceeding 700% annually.

17.     Through ARB, Chao owns and controls a number of predatory online payday loan websites, including FirstLoan.com, InboxLoan.com, InboxCredit.com, BetterDayLoans.com, and CometLoans.com. All of these websites purport to be owned and operated by tiny, remote, economically impoverished Native American tribes.

18.     For example, CometLoans.com is purportedly owned by the Tonto Apache Tribe, a tribe in rural Payson, Arizona, about 95 miles northeast of Phoenix. The Tonto Apache Tribe has 110 enrolled members and an 85-acre reservation, the smallest of any Indian reservation in Arizona. Due to its small size, lack of natural resources, and remote location, the Tonto Apache Tribe has struggled economically.

19.     InboxLoan.com and InboxCredit.com are virtual duplicates of each other, and their websites contain the same graphics, color schemes, logos, and verbiage. The only apparent difference, other than the name variation, is InboxCredit's phone number is listed as 707-207-6106, while InboxLoan's phone number is listed as 800-930-9066.

20.     InboxLoan.com and InboxCredit.com are purportedly owned and operated by the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "**Kashia Tribe**"). In

early 2020, InboxLoan.com was deactivated after a class-action lawsuit was filed against it under the ***Racketeer Influenced and Corrupt Organizations Act*** ("**RICO**"), alleging that the site was facilitating criminal loansharking.

21.     The Kashia Tribe has about 78 members living on its reservation in rural Sonoma County, California. Like the Tonto Apache Tribe, it has no real economic prospects and has struggled economically for decades.

22.     Despite claims that the Kashia Tribe owns both InboxLoan.com and InboxCredit.com, the true beneficial owners of the sites are Chao, his companies, and his non-tribal investors. Chao, *et al.* managed, performed underwriting, collected, and profited from the lending operation, and the Kashia Tribe received around two percent of loan revenues for being the straw owner of the websites and, more importantly, providing a veil of sovereign immunity.

23.     Chao takes advantage of these tribes' desperation by offering to pay them modest amounts in exchange for their claiming ownership of his illegal payday lending operations, enabling Chao to assert that the loans are being made by the tribes themselves.

24.     Such arrangements are referred to as "rent-a-tribe" schemes.

25.     Through such schemes, non-tribal payday lenders attempt to avoid the restrictions of state and federal laws which would otherwise prohibit usurious loans. They do this by issuing loans in the name of a Native American tribal business entity that purports to be shielded from state and federal law via tribal sovereign immunity. In reality, the tribal lending entity is a mere "front" for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing,

electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the Native American tribe.  In exchange for the use of the tribe's name, those operating the payday lending scheme pay the cooperating tribe a fraction of the revenues generated, almost always in the single digits.

26.     However, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to the criminal or civil prosecution of the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir., Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

27.     Chao also owns ARB Call Facilities, which provides call center services for Chao's payday lenders and other entities, with call centers in Costa Rica, the Philippines, Egypt and other locations. *See* The Manila Times, *ARB Call Facilities yearend party*, December 26, 2018,        https://www.manilatimes.net/2018/12/26/public-square/arb-call-facilities-yearend-party/487722/.

28.     Chao owns a significant number of other entities which are related to "tribal" online lending as well, including Sabre Analysis, LLC ("**Sabre**"), whose listed address is identical to ARB's – 4700 Millenia Blvd., Suite 270, Orlando, FL 32839. Sabre's website claims it is a "portfolio servicing company specializing" in "Data Analytics, Lead Purchase Strategy, Collections Strategies (and) Reporting."

**Records Show Chao Owns 'Tribal' Lenders**

29.     Domain registration records from June 16, 2014, show that Inbox Loan's website, www.inboxloans.com, listed "Stanley Chao" as the registrant's name, with an email address of "stanley@arb-co.com" as the administrative, technical and registrant contacts. **SEE PLAINTIFF'S EXHIBIT A**.

30.     The registrant organization for InboxLoans.com was, at that time, Northern Plains Funding, LLC ("**Northern Plains**"), P.O. Box 516, Hays, Montana, 59527. *Id.*

31.     Northern Plains, in turn, claimed to be owned by the Fort Belknap Indian Community ("**Fort Belknap Tribe**") in Hays, Montana.

32.     Sometime between 2015 and 2019, Inbox Loan discontinued its claim that it was owned by the Fort Belknap Tribe in Montana and suddenly claimed it was owned by the Kashia Tribe in California instead. The two tribes have no historical ties to each other, no common language, nor any other factors in common other than they are both able to assert sovereign immunity and willing to claim ownership of otherwise-illegal payday lending websites.

33.     Inbox Loan is not a tribal entity, despite claiming, at different points in time, to be affiliated with two geographically divergent, unrelated tribes; rather, it is an alter-ego for Chao and his investors and associates.

34.     Domain registration records from September 11, 2016, show that Inbox Credit's website, www.inboxcredit.com, listed "Stanley Chao" as the registrant's name, the registrant organization as "Northern Plains Servicing, LLC," an address of "50 Tice Blvd., Suite 160, Woodcliff Lake, New Jersey 07677," and an email address of "stanleychao1@gmail.com" as

the administrative, technical and registrant email contacts. The administrative, technical and registrant phone number is listed as 855-995-9950. **SEE PLAINTIFF'S EXHIBIT B**.

35.     Calling 855-995-9950 on September 26, 2020, resulted in an automated greeting announcing the caller had reached "Sabre." When selecting the "dial by name" directory and entering "2-4-2-6" (for C-H-A-O) only one option was presented: extension 742 for "Stanley."

36.     The address "50 Tice Blvd., Suite 160, Woodcliff Lake, New Jersey 07677" is also the registered address of the Connecticut corporation Inbox Auto, LLC, whose only officer is Stanley Chao.

37.     Likewise, the address "50 Tice Blvd., Suite 160, Woodcliff Lake, New Jersey 07677" appears on credit inquiries made by "INBOX LOANS DBA INBOX CR" on thousands of consumer's Trans Union consumer disclosures. **SEE PLAINTIFF'S EXHIBIT C.**

38.     Inbox Credit is not a tribal entity, either; rather, it is an alter-ego for Chao and his investors and associates.

## Usurious Lending Prohibited in Florida

39.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

40.     Section 687.071(3), Florida Statutes, renders loans made with annual interest rates greater than 45% a third-degree felony.

41.     Section 687.071(7), Florida Statutes, states: "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

42.     Thus, any person who willfully makes such a loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

43.     A loan shark loses their right to collect not only usurious interest, but the original principal balance as well. The "purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender." *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

44.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al*., No. 1:16-cr-00091-PKC (S.D.N.Y).

45.     Inbox Loan and Inbox Credit make usurious payday loans through their websites, InboxLoan.com and InboxCredit.com, respectively.

46.     Inbox Loan and Inbox Credit lend to consumers at interest rates in excess of 700% annually.

47.     Per Inbox Credit's website, a $500 loan results in repayment of $3,904.55 if paid bi-weekly for 48 weeks. The total interest charged is $3,404.55, which equates to an annual percentage rate of 780%. **SEE PLAINTIFF'S EXHIBIT D.**

**Defendants Make Usurious Loan to Ms. Fair and Attempt Collection**

48.     In September 2019, Inbox Loan allegedly issued a $500 loan to Ms. Fair. The interest rate on the loan was over 700% annually.

49.     Ms. Fair repaid **$1,461** over the course of three months, through ACH debits to "INBOX CREDIT," for a loan with a principal balance of **$500**.

50.     As the interest rate on Ms. Fair's loan vastly exceeded the maximum lawful interest rate in Florida, the making, and collection, of the loan constituted a felony pursuant to Section 687.071(3), Florida Statutes.

51.     Thus, the Defendants engaged in criminal actions against Ms. Fair.

52.     Even assuming, *arguendo,* that the Defendants raised a sovereign immunity defense to the criminal prosecution of these offenses, sovereign immunity does not turn an otherwise illegal loan into a legal one. At best, it potentially creates a defense to the criminal or civil prosecution of the Kashia Tribe for the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019).

**Role of Unknown ACH Processor**

53.     Ms. Fair's $1,461 worth of payments to Inbox Loan was facilitated, and thus aided by, Unknown ACH Processor. This person or entity, at the request of the other Defendants, initiated a series of ACH debits from Ms. Fair's checking account with Chase Bank.

54.     The ACH network is administered by the **National Automated Clearing House Association** ("**NACHA**"), which implements numerous requirements which participating payment processors must meet.

55.     One such requirement is that ***Originating Depository Financial Institutions*** ("**ODFIs**") must gather detailed information about the business operations of their customers to whom they grant access to the ACH network. The OFDIs "are the gatekeepers of the ACH Network." *2013 NACHA Operating Rules, Section 2.1 General Rule – ODFI is Responsible for Entries and Rules Compliance (2013 NACHA Operating Rules & Guidelines, Page OR4).*

56.     In 2013, the United States Department of Justice ("**DOJ**") initiated Operation Choke Point and investigated a large number of banks that processed ACH transactions for payday lenders, as well as other companies believed to be at a high risk for fraud and money laundering. As a result of this, many larger banks, including Capital One Bank and Fifth Third Bank, terminated ACH processing for payday lenders. In March 2015, the DOJ announced a civil and criminal settlement with CommerceWest Bank due, in large part, to the bank's processing of payday loan fees.

57.     Although Operation Choke Point wound down in August 2017, its effects are still felt today by the online payday lending industry, as no large banks – and only a handful of smaller banks – will knowingly process ACH transactions for legal, licensed payday lenders. Moreover, upon information and belief, not a single FDIC-insured bank of any size in the United States will knowingly process ACH transactions for "tribally" owned payday loan entities like Inbox Loan.

58.     Thus, an entire cottage industry exists of ACH payment brokers and middlemen servicing the "tribal" payday lending industry. These brokers and middlemen gain the ability to process ACH transactions through small banks and then re-sell access to the ACH network,

at considerable mark-ups. These brokers and middlemen often obfuscate – or outright lie – to their OFDI about the end-user's actual business.

59.     Small, everyday, low-risk businesses typically pay 20 to 30 cents per ACH transaction; larger businesses with processing volumes pay only a few cents. In contrast, it is not unusual for shadowy ACH transaction brokers like Unknown ACH Processor to charge 5% to 15% of the total dollar amount processed, meaning they can profit $50,000 to $150,000 per $1 million processed by their customers. These outsized, windfall profits provide strong motivation for transaction brokers to hide their customers' actual business.

60.     For example, DGD Processing Solutions, LLC ("**DGD**"), told its OFDI, Talmer Bank, that its client, Speedy Servicing, Inc. – which owns many usurious online payday websites, including RapitalCapital.com and MoneyMessiah.com – that the flurry of debits and credits were not related to payday loans but rather "medical billing payments." *DGD Processing Solutions, LLC vs. MD Financial, LLC et al*, Case 2:14-cv-13740-GCS-MKM, U.S.D.C. E.D. Mich, 2014.

61.     Further, because NACHA guidelines require any company processing ACH payments to have a rejected transaction rate of no more than 15%, and a charge-back (*i.e.*, fraud) rate of no more than 0.5% – rates often exceeded by businesses like Inbox Loan – questionable ACH processing middlemen often have to shift particular clients' business from one bank to another to avoid those limits.

62.     Unknown ACH Processor is aware, and was legally required to be aware, of the nature of Inbox Loan's business. Unknown ACH Processor received substantial profit from its role in the usurious loans collected from Ms. Fair and received such profit because it was

willing to facilitate the processing of ACH debits that reputable payment processors would refuse.

63.     Unknown ACH Processor's PPD ID is 1028590152; alternately, Unknown ACH Processor subcontracts with the owner of PPD ID 1028590152. Plaintiff intends to subpoena relevant records to ascertain the true identity of Unknown ACH Processor and amend her complaint accordingly.

### Illegal Loans Took Place in Florida; Subject to Florida Law

64.     Inbox Loan's web server's IP address is 52.43.81.11, which corresponds to a physical location in Oregon, more than 600 miles from the Kashia Tribe's reservation.

65.     Moreover, this IP address is shared with 10 other websites. All 10 have direct connections to Stanley Chao. They include ARBCalls.com, ARBCares.com, BetterDayLoans.com, CometLoans.com, FirstLoan.com, InBoxCredit.com, NPCredit.com, and Sabre-Analysis.com. **SEE PLAINTIFF'S EXHIBIT E.**

66.     Inbox Loan's lending does not actually occur on an Indian reservation, regardless of whether certain administrative aspects may be addressed on the Kashia Tribe's land.

67.     A significant majority of the transaction occurs within the State of Florida – from completing the application to receiving the funds.

68.     Ms. Fair, like most Inbox Loan customers, acquired the loan without leaving her home. The loaned funds were deposited into her bank account in Brandon, Florida.

69.     Recently, federal appellate courts have held that where a consumer is located when they submit an application via an online portal with a Native American tribe determines

where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

70.    Ms. Fair has never set foot on the Kashia Tribe's land in California.

71.    Thus, as the loan was requested and obtained in Florida, the proceeds of the loan were transferred to a Florida bank, payments were debited from a Florida bank, and collection emails, texts and phone calls were made to Ms. Fair at her home in Florida, then the loan occurred in Florida and was governed by the laws of the State of Florida. Additionally, Chao, the beneficial owner of Inbox Loans, is a Florida resident, and his related servicing companies – like ARB and Sabre – are registered with the Florida Secretary of State while their primary business addresses are in Orlando.

## **Defendants Have No Legitimate Sovereign Immunity**

72.    An entity which functions as an arm of the tribe shares that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010), (holding "tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between the tribe and the entity **is sufficiently close** to properly permit the entity to share in the tribe's immunity") (**emphasis added**).

73.    To determine if a particular entity is entitled to immunity, the majority of courts have adopted the framework laid out in *Breakthrough,* at 1187-88, which analyzed:

a.   [the entities'] method of creation;

b.   their purpose;

c.   their structure, ownership, and management, including the amount of control the tribe has over the entities;

d.   whether the tribe intended for the entities to have tribal sovereign immunity;

e.   the financial relationship between the tribe and the entities; and,

f.   whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.

74.     Pursuant to the framework laid out in *Breakthrough*, Inbox Loan fails in virtually every aspect.

75.     At all times relevant, Inbox Loan employed few, if any, tribal members who worked on the Kashia Tribe's lands, while many times more non-tribal employees worked in call centers and offices off tribal lands, managing and operating the business. These call centers, not coincidentally, are owned by Chao.

## Method of Creation

76.     With respect to the method of creation and circumstances surrounding Inbox Loan, the Kashia Tribe did not start its own lending enterprise but rather slapped its name onto an existing business which had already been established by non-tribal persons. Indeed, in the past, InboxLoan.com was supposedly owned by a *different* tribe and could not have been *created* by the Kashia Tribe.

77.     The Fort Belknap Tribe in Hays, Montana – the original "owners" of Inbox Loan – are involved in myriad rent-a-tribe schemes of their own, claiming to own over 20 payday lending companies despite a 65% unemployment rate and virtually non-existent

financial resources. One such website called "The Cash Fairy" featured a cartoon, winged fairy with a scepter and money bag delivering cash with the tag line, "getting cash shouldn't be like pulling teeth." The website was beneficially owned by California real estate millionaire Paul Anthony Pellizzon through a holding company called Center Ice Servicing, Inc. The Cash Fairy made loans at 800% annual interest and garnered significant media attention, including from HBO's *Last Week Tonight With John Oliver* and CNBC.

78.     The Kashia Tribe was simply willing to rent out its sovereign immunity for even less money than the original "tribal" owners in Montana. Chao and ARB took advantage of the opportunity to reduce their expenses, and thus, the Kashia Tribe became the "new" owners of Inbox Loan and Inbox Credit.

79.     Evidence shows that Inbox Loan was created by Chao, with the Kashia Tribe joining much later, contributing virtually nothing to the business other than providing a thin veneer of sovereign immunity.

80.     The repurposing of a pre-existing entity suggests that there is not sovereign immunity. *See Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018) (stating "the tribe was not starting an independent lending operation but rather facilitating the absorption of Red Rock's fully-functioning lending enterprise-which had a decidedly non-tribal character.").

## Purpose

81.     Evidence of "the number of jobs [the entity] creates for tribal members or the amount of revenue it generates for the tribe" suggests that it is an arm of the tribe, but "evidence that the entity engages in activities unrelated to its stated goals or that [it] actually **operates to**

**enrich primarily persons outside of the tribe** or only a handful of tribal leaders" shows the opposite. *People ex rel. Owen v. Miami Nation Enters.*, 2 Cal. 5th 222 (Cal. 2016) (**emphasis added**).

82.     Less than 2% of lending revenues actually remain in possession of the Kashia Tribe, with the remainder benefiting Chao, ARB, and their non-tribal investors.

83.     Thus, the primary purpose that non-tribal investors had in helping the Kashia Tribe manage and operate payday websites like Inbox Loan was to *enrich themselves,* not the tribe. The few pennies on the dollar received by the Kashia Tribe is simply a cost of doing business – and at a lower cost to Chao and ARB than the Kashia Tribe's other tribal competitors.

### Structure, Ownership, and Management

84.     On information and belief, Chao exerts near unilateral control over the lending business.

85.     Non-tribal individuals perform the lion's share of the work required to run Inbox Loan and Inbox Credit, including underwriting, collecting, and servicing the loans.

86.     When a consumer applies for a loan, software utilized and controlled by Chao through his Sabre subsidiary assigns a "risk score" to the applicant. Chao does not reveal to the Kashia Tribe how the "risk score" is calculated. The tribe's approval of the loan is *pro forma*, and involves simply electronically approving the decision already made by Chao's non-tribal companies.

87.     The Kashia Tribe has no say over which loans are funded; however, they do receive a small percentage of profits for providing the veneer of sovereign immunity, and thus received a portion of the illegal interest paid by Ms. Fair.

88.     Courts have found these facts to be contrary to the successful assertion of sovereign immunity. *See Williams*, 329 F. Supp. 3d at 279 (finding that a similar non-tribal entity exerted control over a purportedly tribal payday lender by unilaterally determining the criteria for prescreened credit offers).

### Financial Relationship between the Tribe and Chao, *et al.*

89.     As aforementioned, the Kashia Tribe receives only a small portion of Inbox Loan's revenues.

90.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes.

91.     Pursuant to the *Breakthrough* Court's analysis, Inbox Loan is not an "arm of the tribe" and cannot escape the purview of state usury laws under the doctrine of sovereign immunity.

### Chao and ARB

92.     As aforementioned, Chao, through his related companies, including ARB, is the true beneficial owner of Inbox Loan and Inbox Credit.

93.     Accordingly, Chao and ARB both received proceeds from the collection of Ms. Fair's unlawful debt. Unknown ACH Processor received commissions in the range of $80 to $200 for its role in facilitating the ACH debits and obfuscating their true nature.

94.     Further, Chao and ARB are responsible for orchestrating the scheme pursuant to which Inbox Loan lent money to Ms. Fair at usurious interest rates.

95.     Ms. Fair has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FCCPA

96.     Ms. Fair incorporates paragraphs 1 – 95 as if fully stated herein.

97.     ARB violated **Section 559.72(9), Florida Statutes**, when it asserted the existence of a legal right which does not exist, specifically the right to collect an online payday loan issued at an interest rate exceeding 700% annually, when such a loan is null, void, and contrary to public policy.

98.     ARB violated **Section 559.72(9), Florida Statutes**, when it asserted a debt was legitimate when it was not, when it sent emails and text messages to Ms. Fair reiterating that she had payments due on her loan, even after she had more than repaid double the amount of the $500 principal balance.

99.     ARB acted willfully in issuing the usurious loan to Ms. Fair and collecting such loan, as Chao and ARB have been issued cease-and-desist orders by state governments for similar conduct and are aware that such loans are illegal.

100.    ARB's conduct renders it liable for the above-stated violations of the FCCPA.

**WHEREFORE,** Ms. Fair respectfully requests this Court enter judgment against ARB for:

a.      Statutory damages of **$1,000.00** pursuant to section 559.77(2), Florida Statutes;

b.      Actual damages of at least **$1461**, pursuant to section 559.77(2), Florida Statutes;

c.      Injunctive relief prohibiting Chao and ARB from making any further collection attempts that violate Florida law pursuant to section 559.77(2), Florida Statutes;

d.      Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and,

e.      Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE CRCPA

101.    Ms. Fair incorporates paragraphs 1 – 95 as if fully stated herein.

102.    The Defendants violated **Section 772.103(1), Florida Statutes**, when, with criminal intent, they received proceeds from the issuance of a usurious loan to Ms. Fair, in Florida, which charged interest well in excess of 45% interest per annum, in violation of Section 687.071(3), Florida Statutes, and thus constituted an unlawful debt. The Defendants knew the debt was unlawful at the time it was issued and purposely sought to conceal their unlawful debt collection activities behind an Indian tribe under a veil of sovereign immunity. With respect to Unknown ACH Processor, they knew or should have known of the criminal nature of the loan as evidenced by the fact that they were being paid more than 50 times the

normal rate for their services, and they concealed to their partner banks the fact that they were processing online payday loans.

103.    Chao and ARB, operating as Inbox Loan, knowingly engaged in a pattern where they made loans well in excess of 45% interest per annum, in violation of **Section 687.071(3), Florida Statutes**, and then proceeded to collect these unlawful debts and obtain proceeds therefrom, through ACH debits, phone calls, emails and text messages. ARB and Chao used the proceeds of this unlawful debt collection in the operation of their ongoing business enterprise.

104.    ARB violated **Section 772.103(3), Florida Statutes**, in that, through its association with Inbox Loan and the Kashia Tribe, it knowingly engaged in criminal activity – a pattern where it made loans well in excess of 45% interest per annum, in violation of **Section 687.071(3), Florida Statutes** – and then proceeded to collect these unlawful debts and obtain proceeds therefrom, through ACH debits, phone calls, and emails to Ms. Fair in Florida.

105.    ARB, by and through its agents and employees, directly participated in the issuance of the unlawful debts through Inbox Loan and Inbox Credit.

106.    The Defendants violated **Section 772.103(4), Florida Statutes**, when they knowingly conspired to engage in criminal activity, a pattern where they made loans well in excess of 45% interest per annum, in violation of **Section 687.071(3), Florida Statutes**, and then proceeded to collect these unlawful debts and obtain proceeds therefrom, through ACH debits, phone calls, and emails to Ms. Fair in Florida.

107.    The Defendants knew, or should have known, that Inbox Loan's loans are usurious in Florida. The Defendants' business model readily acknowledges the illegal nature

of the loans, and goes to great lengths to obfuscate how, and by whom, the loans are made, attempting to deceive consumers into believing that they have no legal recourse against the enforcement of such debts.

108.    The Defendants' conduct renders them liable for the above-stated violations of **Section 772.103(1), Florida Statutes**.

**WHEREFORE,** Ms. Fair respectfully requests this Court enter judgment against the Defendants, jointly and severally, for:

a.    Treble actual damages of at least **$1461** (for a total of **$4383**), or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to Section 772.104(1), Florida Statutes;

b.    Reasonable costs and attorneys' fees pursuant to Section 772.104(1), Florida Statutes;

c.    An injunction of Estoppel against Defendants from engaging in any further action in violation of Florida law, pursuant to Section 772.14, Florida Statutes; and,

d.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## VIOLATIONS OF THE FDCPA

109.    Ms. Fair incorporates paragraphs 1 – 95 as if fully restated herein.

110.    ARB, acting as "Inbox Loan" and, per some ACH debits, also "Inbox Credit," violated **15 U.S.C. §1692e(2)(a)** when it made false representations regarding the character or legal status of a debt, by falsely representing that the debt was enforceable despite being

unenforceable as usurious under Florida law, and that it had a legal right to collect loan payments, when no such right exists. ARB, acting as "Inbox Loan," directly or through agents, emailed, called, and texted Ms. Fair with collection communications.

111.    ARB, acting as "Inbox Loan" and, per some ACH debits, also "Inbox Credit," violated **15 U.S.C. § 1692e and 1692e(10)** in that it used false, deceptive, and misleading representations in connection with the collection of a debt by falsely representing that the debt was legally enforceable when it was usurious and unenforceable under Florida law.

112.    ARB, acting as "Inbox Loan" and "Inbox Credit," violated **15 U.S.C. §1692e(14)** in that it used a business and company name other than its own in connection with the collection of a debt.

113.    ARB, acting as "Inbox Loan" and "Inbox Credit," violated **15 U.S.C. §1692f(1)** when it attempted to collect, *and collected*, an amount which included an illegally applied interest rate of over 700 percent per annum, when such fees are felonious under **Section 687.071(3), Florida Statutes**.

114.    ARB's actions were willful and intentional and representative of its normal business practices.

**WHEREFORE**, Ms. Fair respectfully requests this Court enter judgment against ARB for:

a.    Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.    Actual damages pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.    Such other relief that this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Ms. Fair hereby demands a jury trial on all issues so triable.

Respectfully submitted on **November 25, 2020,** by:

**SERAPH LEGAL, P. A.**
/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
FBN: 1015954
BMorgan@SeraphLegal.com
/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
FBN: 118103
TBonan@SeraphLegal.com
2002 E. 5th Ave., Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Attorneys for Plaintiff*

**ATTACHED EXHIBIT LIST**

A       Domain Registration Records for InboxLoan.com, Record Date: June 16, 2014
B       Domain Registration Records for InboxCredit.com, Record Date: September 11, 2016
C       Unrelated Consumer's Trans Union Disclosure Including InboxLoan Inquiry
D       InboxCredit.com, Sample Rate Chart
E       IP Address Server Location for Chao's Payday Lenders